**Domenico TAGLIERI, Plaintiff-Appellee,**

v.

**Michelle MONASKY, Defendant-Appellant.**

No. 16-4128

United States Court of Appeals, Sixth Circuit.

Argued: May 3, 2017

Decided and Filed: November 30, 2017

ARGUED: Christopher J. Baum, GIBSON, DUNN & CRUTCHER, LLP, Washington, D.C., for Appellant. John D. Sayre, NICOLA, GUDBRANSON & COOPER, LLC, Cleveland, Ohio, for Appellee. ON BRIEF: Christopher J. Baum, Amir C. Tayrani, Melanie L. Katsur, GIBSON, DUNN & CRUTCHER, LLP, Washington, D.C., Christopher R. Reynolds, Amy M. Keating, ZASHIN & RICH CO., L.P.A., Cleveland, Ohio, for Appellant. John D. Sayre, Amy Berman Hamilton, NICOLA, GUDBRANSON & COOPER, LLC, Cleveland, Ohio, for Appellee. Rachel G. Skaistis, CRAVATH, SWAINE & MOORE LLP, New York, New York, for Amicus Curiae.

Before: BOGGS, MOORE, and McKEAGUE, Circuit Judges.

BOGGS, J., delivered the opinion of the court in which McKEAGUE, J., joined. MOORE, J. (pp. 879–84), delivered a separate dissenting opinion.

## OPINION

BOGGS, Circuit Judge.

Our decision in this case is controlled by the 1980 Hague Convention on the Civil Aspects of International Child Abduction ("Convention" or "Hague Convention"), which dictates that a wrongfully removed child must be returned to the country of habitual residence. Our precedent has demonstrated that where a child lives exclusively in one country, that country is presumed to be the child's habitual residence. In fact, we have gone so far as to call such cases "simple." Because we hold that in this case the country of habitual residence is Italy and that there is no grave risk of harm to the child under the meaning of the Convention, we must affirm the district court's judgment ordering the return of A.M.T. to Italy under the Hague Convention.

## I

Domenico Taglieri, a citizen of Italy, was studying for a doctoral degree at the University of Illinois at Chicago, when he met Michelle Monasky, an American citizen who was joining his research team. The two colleagues began dating and eventually married in September 2011. Taglieri received his Ph.D. in 2011 and obtained a post-doctoral appointment at the University of Illinois at Chicago. The two made the mutual decision to move to Italy to pursue career opportunities, with Taglieri leaving first in February 2013. According to Taglieri, he had made it clear that he considered Italy to be his long-term destination, as he was licensed to practice medicine in Italy and would have had to acquire certifications and meet onerous requirements to

practice in the United States. But in an e-mail Monasky sent to Taglieri in April 2013, she wrote: "don't think that [the fact that we are moving to Milan or Rome] means we are done with the US [for good.]"

Taglieri began working at a hospital in Palermo, Italy, in February 2013. In June 2013, he switched to a new position as an anesthesiologist at Humanitas Hospital in Milan. The next month, Monasky moved to Italy to join Taglieri in Milan. She received a fellowship with Università Vita Salute San Raffaele in Milan in September 2013. In April 2014, Monasky was given a two-year fellowship with Humanitas Hospital, with a significant increase in pay. Taglieri had a one-year contract with Humanitas Hospital, which the hospital did not offer to renew, and he began looking elsewhere for a new position. In June 2014, he secured a permanent position with Maria Cecilia Hospital in Lugo, a city outside of Ravenna that is about two hours and forty minutes by car southeast of Milan. In addition, he found an apartment in Lugo where he could stay during the workweek.

Monasky became pregnant in May 2014. According to Taglieri, the couple had decided to start a family and try for a child. Monasky disputes this description, stating that she had become pregnant despite her wishes because of Taglieri "becoming more aggressive with sex." She recounts in particular one occasion where Taglieri allegedly got on top of her and insisted, "[S]pread your legs, or I will spread them for you." In addition to sexual abuse, Monasky alleges that Taglieri frequently slapped or hit her with force, causing her to grow increasingly fearful. Taglieri acknowledges "smack[ing]" Monasky once in March 2014, but denies that he struck her again after that time. The district court in this case concluded that Taglieri had "struck Monasky on her face in March

2014," and found Monasky's further testimony with respect to the domestic abuse credible.

Tension was increasing in the marriage for other reasons in addition to the physical and sexual abuse. The long-distance arrangement of Taglieri's frequent travel and stays in Lugo while Monasky was in Milan put greater strain on the marriage. Furthermore, in accordance with Italian law, Monasky was required to suspend her work and go on maternity leave in January 2015, in anticipation of the upcoming birth of her child. She encountered difficulties in having her academic credentials recognized by Italy, to the degree that she wrote to the United States Senator of her family's home state of Ohio for assistance. Monasky did not speak much Italian and had significant problems performing basic tasks, such as calling someone to fix the electricity, as a result. Finally, her pregnancy was medically complicated, with Monasky suffering a near-miscarriage early on.

All of these stressors produced a rocky relationship. Monasky applied for jobs in the United States, contacted American divorce lawyers, and researched American health- and childcare options. But the couple also investigated Italian child-care options and discussed purchasing items for the baby, such as a stroller, car seat, and night light. Monasky sought an Italian driver's license and she and Taglieri moved to a larger apartment in the Milanese suburb of Basiglio under a one-year lease under Monasky's name (with the option to break the lease on three months' notice). By January, "emails between the parties, reflecting words of affection, suggest that their relationship was less turbulent than before." Serenity, if it did exist, was short-lived. In early February, the two began "having a lot of fights," and arguing over how the birth would proceed. Monasky e-mailed Taglieri regarding a possible collaborative divorce. At the same time, she sought quotes for the cost of moving to back to Ohio.

At a subsequent pregnancy-check-up appointment in mid-February, doctors recommended that labor be induced. Monasky declined and the two left despite Taglieri's protestations. According to Taglieri, he was angry, concerned, and embarrassed that Monasky had refused the procedure, rejected the advice of fellow physicians, and declined to stay at the hospital. During the forty-minute ride home, the pair argued over Monasky's decision. Minutes before they arrived at their apartment, Monasky told Taglieri that she had begun experiencing contraction-like pains and asked him to bring her back to the hospital. Taglieri refused, advising that they should wait and see how things progressed. By this point, it was after ten o'clock in the evening. The two arrived at the apartment and continued to argue. During this "heated conversation," Taglieri called Monasky "the son of a devil" and told her that she could take a taxi back to the hospital if she wanted to return. Sometime during the very early morning hours of the next day, Monasky took a taxi to the hospital—having experienced contractions all night long. Taglieri contends that Monasky left while he was sleeping, and he immediately went to the hospital once he awoke and learned that Monasky was already on her way.

After protracted labor, A.M.T. was born via an emergency caesarean section. Taglieri and Monasky's mother, whom he had brought from the airport, were present for the birth. After Monasky was released from the hospital after a week's stay, Taglieri returned to Lugo while Monasky endured a "difficult" recovery in Basiglio, cared for by her mother. Her recovery was hampered by a previous surgery, which—coupled with the caesarean section—made

rising or sitting strenuous. Taglieri returned to Basiglio at the beginning of March, following the departure of Monasky's mother, and Monasky broached the subject of divorce once more. She renewed the discussion in an e-mail sent the next day, noting that although Taglieri "seemed ... not ready," she wanted to divorce him amicably and leave Italy with A.M.T. Monasky informed her family of her intentions to divorce Taglieri through numerous e-mails. Taglieri returned to Lugo alone on March 2, but the next day Monasky agreed to join him in Lugo with A.M.T. The parties strongly dispute the motivation behind the trip: Monasky stated that she agreed "in a moment of weakness," given the difficulties of caring for a newborn child alone while recovering from the caesarean section, and brought only "a couple of suitcases and [a] stroller." Taglieri hoped the couple would use the time to "clarify any existing issues."

Taglieri described the family's time in Lugo as a reconciliation, during which they returned to "the regular course of ... life." Monasky continued preparations to take her Italian driving test by signing up with a driving school for mandatory lessons and completing a number of sessions, registered the family for an au pair and sought childcare for "June [through] August," scheduled doctor's appointments for A.M.T., and coordinated with her aunt to schedule a future visit to Italy in September. The couple celebrated A.M.T.'s one-month birthday, traveled to Bologna for a family day-trip, discussed ideas regarding their scientific work, and asked Monasky's mother-in-law to babysit A.M.T. when Monasky traveled to a professional conference in Germany in July.

Conversely, Monasky stated that the trip to Lugo was not an attempt to reconcile the marriage; rather, her intent to leave Italy was fixed. She explained the coordination with her aunt was the result of not wanting to mention an impending divorce to a family member who was only an infrequent contact, and she hoped to be able to explain things face-to-face in the United States. As for the driver's license and medical appointments, Monasky testified that they were necessary to take care of A.M.T. and "until [she and A.M.T.] could return to the United States, [she and Taglieri] were just doing what any parent would do and just schedul[ing] appointments."

Monasky also engaged in a number of other activities that indicated that she would be in Italy in at least the near future: she wrote to her OB/GYN in Milan and stated that she hoped to bring A.M.T. to meet her and she continued her attempts to get her degrees recognized. She was, however, in contact with Italian divorce attorneys in an attempt to learn more about Italian divorce law and child custody. Additionally, in early March 2015 Monasky withdrew Taglieri's access to a joint investment account, allegedly out of concern that he would remove all of its funds and then leave her with nothing. Taglieri was upset that he could not view the account, and Monasky restored his access within a week. While the two were in Lugo, they arranged to complete the process of registering A.M.T.'s birth at the United States consulate and obtaining her Italian and American passports (a process that had begun in late February). According to Taglieri, these passports were necessary for a trip that was planned for the family to visit Monasky's family in the United States in May.

On March 31, 2015, Monasky and Taglieri had another argument, which began over Taglieri refusing to allow Monasky to change A.M.T.'s clothes after she had urinated in them because of the cost of laundry. In the course of the argument,

Monasky slammed the table. According to Monasky, Taglieri raised his hand as if to strike her with a terrible look on his face that frightened her. Taglieri did not hit her, however. After this, Taglieri left for work and Monasky took A.M.T. to the police, reported her husband, and sought refuge in a safe house in an undisclosed location. Her statement to the police indicated that her husband was abusive, that at the hospital nursery he had shouted at a crying A.M.T. that he would buy formula and shove it up A.M.T.'s bottom, and that she was frightened that Taglieri would kill her. She indicated that she was "waiting in Lugo for [her] exam [on] April 15, then [would] try to return to Milan, and try to open a new bank account for my salary, [etc.]" Taglieri returned home to find an empty apartment and neither Monasky nor her parents would answer his phone calls. He went to the police, explaining that he could not find his wife and child, and asked if they could send a police car to check the Basiglio apartment to see if she was home. The police instead suggested that he find himself a lawyer.

Taglieri did acquire counsel and eventually was put into contact with Monasky over the phone. Through his counsel, he sought to withdraw his consent for the American passport application and to block A.M.T.'s passports to prevent her from leaving the country. Despite these efforts, Monasky obtained her daughter's American passport and left Italy with eight-week-old A.M.T. on April 15, 2015, for the United States. Taglieri was informed that Monasky and A.M.T. had gone missing from the safe house and he sought proceedings in an Italian court to determine his parental rights. The court terminated Monasky's parental rights, and Taglieri filed a petition in the United States District Court for the Northern District of Ohio on May 14, 2015, seeking the return of his daughter to Italy pursuant to the Convention. The parties then presented their arguments before Chief Judge Solomon Oliver, and Monasky sought summary judgment and the denial of the request for a return order.

After denying Monasky's motion for summary judgment, the district court held a four-day trial in March 2016. In an order issued six months later, the district court granted Taglieri's petition for the return of A.M.T. to Italy, to be accomplished within forty-five days. The district court held that in cases of very young children, "the shared intent of the parties is relevant," and that under this standard, A.M.T.'s habitual residence (and therefore the location that she should be returned to) was Italy. Chief Judge Oliver found that Monasky had no definitive plans to return to the United States until the final altercation at the end of March. Finally, the court also held that the other requirements of the Convention had been met: Taglieri had properly exercised his custody rights, A.M.T.'s removal was wrongful, and Monasky had not shown by clear and convincing evidence that Taglieri posed a grave risk of harm to A.M.T. Monasky moved to stay the order pending appeal to the Sixth Circuit and her motion was partially granted by the district court to give this court the opportunity to rule on the motion. We denied the motion to stay, finding that "a balance of ... [relevant] factors weighed against staying the return order." An application for an emergency stay pending appeal submitted to Justice Kagan also was denied. As a result, A.M.T. was returned to Italy.

## II

■ The object of the Hague Convention, as professed in its preamble, is "to protect children internationally from the harmful effects of their wrongful removal

or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Convention on the Civil Aspects of International Child Abduction pmbl., Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 49 (reprinted at 51 Fed. Reg. 10494 (Mar. 26, 1986)). In order to do so, the Convention established a system whereby "a court in the abducted-to nation has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute." *Friedrich v. Friedrich*, 78 F.3d 1060, 1063 (6th Cir. 1996) ("*Friedrich II*"); Convention art. 19. This system is "generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Friedrich II*, 78 F.3d at 1064.

■ Under the federal implementing statute, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–9008, 9010–9011 (Supp. II 2014), 42 U.S.C. § 663 (2012), a petitioner seeking the return of a child must establish by a preponderance of the evidence "that the child has been wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A). The Convention (in relevant part) defines as wrongful the removal or retention of a child "in breach of rights of custody ... under the law of the [Contracting] State in which the child was habitually resident immediately before the removal or retention." Convention art. 3. The initial critical question that we must address is whether Taglieri has established that A.M.T. was removed in breach of the law of the State in which she was habitually resident. If so, we must determine whether an exception applies. "We review the district court's findings of fact for clear error and review its conclusions about American, foreign, and international law *de novo*." *Friedrich II*, 78 F.3d at 1064.

A. Habitual Residence

The answer to the first question depends upon the meaning of the term "habitual residence." This court has had the opportunity to explore its meaning before, and a brief summary of our past analysis is in order here. When we were first confronted with the term in *Friedrich v. Friedrich*, 983 F.2d 1396 (6th Cir. 1993) ("*Friedrich I*"), we called the facts before us "a simple case. [The child] was born in Germany and resided exclusively in Germany until his mother removed him to the United States ... ; therefore, we hold that [the child] was a habitual resident of Germany at the time of his removal." *Id.* at 1402. In *Simcox v. Simcox*, 511 F.3d 594 (6th Cir. 2007), we also held that a child who "was born in Mexico and resided there her entire life (other than for some temporary sojourns abroad)" was a habitual resident of Mexico, describing the case as similarly simple. *Id.* at 602. *Simcox* and *Friedrich I* therefore stand for the proposition that when a child has lived exclusively in one country, that country is presumed to be the child's habitual residence.

In *Robert v. Tesson*, 507 F.3d 981 (6th Cir. 2007), we considered a more difficult question, namely, "what standard should apply when a child has alternated residences between two or more nations." *Id.* at 992. In those cases, we held that "a child's habitual residence is the nation where, at the time of their removal, the child has been present long enough to allow acclimatization, and where this presence has a 'degree of settled purpose from the child's perspective.' " *Id.* at 993 (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)). However, we expressly left resolution of the yet more difficult questions of the application of *Robert*'s acclimatization standard to the case of a child "who lacks cognizance of his or her sur-

roundings," and whether the subjective intentions of such a child's parents are relevant to determining habitual residence. *Id.* at 992 n.4; *see also Simcox*, 511 F.3d at 602 n.2 ("[T]his standard may not be appropriate in cases involving infants or other very young children."). We recently resolved these questions in *Ahmed v. Ahmed*, 867 F.3d 682 (6th Cir. 2017), a case involving very young children traveling between nations. We concluded that, under those circumstances, a court may determine a very young child's habitual residence by considering the "shared parental intent" of where the parents last mutually intended the child to live. *Id.* at 689–90.

■ This brief survey reveals that we use three distinct standards to determine a child's habitual residence under the Convention. In cases where the child has resided exclusively in a single country, that country is the child's habitual residence. But when the child has alternated residences between two or more nations, our analysis is more complicated. In such cases, we begin by applying the acclimatization standard. *See id.* at 690. If that test supports the conclusion that a particular country is the child's habitual residence, then that is the end of the analysis. But if the case cannot be resolved through application of the acclimatization standard, such as those cases that involve "especially young children who lack the cognizance to acclimate to any residence," we then consider the shared parental intent of the child's parents. *Ibid.* ("The conclusion that the acclimatization standard is unworkable with children this young then requires consideration of any shared parental intent.").

■ With this framework in mind, we observe that a straightforward application of precedent would seem to compel the conclusion that the habitual residence of A.M.T. was Italy. Here, A.M.T. was born

in Italy and resided there exclusively until Monasky took A.M.T. to the United States in April 2015. Similarly, *Friedrich I* based its conclusion that the child in question had a habitual residence in Germany on the fact that the child had "resided exclusively in Germany." 983 F.2d at 1402. *Simcox* also found exclusive residence dispositive. 511 F.3d at 602.

Monasky and the dissent contend that our recent opinion in *Ahmed* requires a different result. It is true that *Ahmed* spoke broadly about young children, but it dealt specifically with the application of the acclimatization standard, which both *Robert* and *Simcox* recognized as difficult to apply in cases of small children. *Robert*, 507 F.3d at 992 n.4; *Simcox*, 511 F.3d at 602 n.2. But *Robert* made clear that the acclimatization test did not apply to children who had remained in one nation; rather, that test "should apply when a child has alternated residences between two or more nations." 507 F.3d at 992. Properly understood, then, *Ahmed*'s adoption of a shared-parental-intent standard makes such intent relevant only in those cases where the acclimatization standard both applies and fails. *See Ahmed*, 867 F.3d at 689 (explaining that the "most compelling reason" for adopting the shared-parental-intent standard was the inability of the acclimatization test of *Robert* to address the situation of young children). Accordingly, *Ahmed* did not modify or displace the alternative standard and guidance that *Friedrich I* and *Simcox* provided for children with exclusively one country of residence. *Robert* and *Ahmed* dealt with one situation, while *Friedrich I* and (in part) *Simcox* dealt with another.

Consequently, the dispositive factor here is that this is not a case where "a child has alternated residences between two or more nations," the situation that *Robert*'s acclimatization test was crafted to address and

the one that faced the *Ahmed* panel. *Robert*, 507 F.3d at 992; *see also Ahmed*, 867 F.3d at 684–86. Instead, prior to the removal in question, A.M.T. never was outside of Italy. "It would seem that [if] the child has only ever lived in the country where he is born, he must be habitually resident there." Rhona Schuz, *The Hague Child Abduction Convention: A Critical Analysis* 203 (2013). Such a statement appears to hold true for the mine-run of cases. Where a child has remained in one place for its entire life, that place is the expected location where it may be found and may be considered its residence. Thus, A.M.T.'s habitual residence was the country from which she was taken, Italy.[1]

We recognize that there can be some difficulties with our approach. What of the case of *Delvoye v. Lee*, 329 F.3d 330 (3rd Cir. 2003), where a pregnant mother was convinced by the father of the child to give birth in his country for reasons of cost, but lived out of her suitcases and never intended to remain in the new country? *Id.* at 332. Such a scenario is not beyond imagination in our circuit; "birth tourism" for reasons of cost or citizenship is not unheard of and could lead to situations like that in *Delvoye*. We presume that such cases will be few and best dealt with as they arise, in keeping with the Convention's more flexible and fact-intensive nature.[2] *See Robert*, 507 F.3d at 989 ("[H]abitual residence should not be determined through the 'technical' rules governing legal residence or common law domicile" and instead should be guided by "[t]he facts and circumstances of each case.") (second alteration in original) (quoting *Friedrich I*, 983 F.2d at 1401).

## B. Exercise of Custody Rights

■■■ The district court also concluded that "Taglieri has proven, by a preponderance of the evidence, that he was exercising his custody rights to A.M.T. under Italian law at the time of her removal." The burden of proving the exercise of custody rights falls on the petitioner, who must establish it by a preponderance of the evidence. *Friedrich II*, 78 F.3d at 1064; 22 U.S.C. 9003(e)(1)(A). "Custody rights 'may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of the State.'" *Friedrich II*, 78 F.3d at 1064 (quoting Convention art. 3).

Under Italian law, parental responsibility and authority over a child are held by both parents, exercised by mutual accord. 1 C.c. tit. IX, art. 316 (It.). With marriage, a husband and wife acquire the same rights and assume the same duties. 1 C.c. tit. VI, art. 143 (It.). But even upon separation of married parties, the parental responsibilities of both parents continue. 1 C.c. tit. IX, art. 317 (It.). "Under Italian law, the term 'parental responsibility,' though not explicitly defined, 'implies the totality of rights and duties exercised exclusively in the interest of the child by the parents.'" *Taglieri v. Monasky*, No. 1:15-cv-00947-SO, slip op. at 23 (quoting Pl.'s Ex. 60, Prof. Salvatore Patti et al., *Parental Responsibilities: Italy* ¶ 1). Moreover, an Italian juvenile court has determined that Taglieri has parental rights. Thus, it is clear that Taglieri had custody rights to A.M.T. at the time of the removal.

1. Again, we reiterate that our case does not concern an infant who has resided in multiple countries, which is the situation that *Ahmed* addressed. We limit our scope to those cases where a child has been residing exclusively in one State prior to a contested removal.

2. Other cases with potential problems might include unexpected births in a foreign country, children born to itinerant parents, or physical coercion. We express no opinion on what the appropriate standard should be for such cases.

"[I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Friedrich II,* 78 F.3d at 1066. There is no evidence of such acts in this record. Taglieri took A.M.T. on a family trip to Bologna and held a celebration for her first month, among other parental acts. Even after A.M.T. was removed from Italy, "Taglieri [took] steps to remain in contact with A.M.T." *Taglieri v. Monasky,* No. 1:15-cv-00947-SO, slip op. at 24. The district court's conclusion that Taglieri was exercising his custody rights to A.M.T. was not clear error. Accordingly, Taglieri sufficiently demonstrated that the removal of A.M.T. was wrongful.

### C. Grave Risk of Harm

Our holding that the removal of A.M.T. was wrongful does not completely resolve the case. Monasky argues that even if we hold that the removal was wrongful, an exception applies. The Convention provides that "the judicial ... authority of the requested State is not bound to order the return of the child if [the opposing party] establishes that ... there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention art. 13. The burden of proof established by ICARA is Monasky's, who must demonstrate the grave risk of harm by "clear and convincing evidence." 22 U.S.C. 9003(e)(2)(A). We review the district court's decision with regard to grave risk *de novo. Simcox,* 511 F.3d at 601.

*Simcox* illustrates the required showing where a grave risk is alleged. We stressed that the exception "is to be interpreted narrowly, lest it swallow the rule." *Id.* at 604. But we also noted that "there is a danger of making the threshold so insurmountable that district courts will be unable to exercise any discretion in all but the most egregious cases of abuse." *Id.* at 608. Findings of grave risk are necessarily fact intensive, and thus the findings of the district court are particularly instructive. In this case, the district court found Monasky's testimony with respect to the domestic and sexual abuse against her to be credible. But the court also observed that "the frequency with which Taglieri subjected Monasky to physical violence and severity of the physical violence is unclear," and found that there was "no evidence to suggest that Taglieri was ever physically violent towards A.M.T." The first half of the exception makes plain that the risk of physical or psychological harm is directed to the child. In *Simcox,* the petitioner (the children's father) had repeatedly struck and belted the children, under the ostensible authority of parental discipline. *Id.* at 599. Our court held that the burden of establishing by clear and convincing evidence a grave risk of harm had been met in that case and that undertakings directed to maintaining the safety of the children likely were appropriate, subject to the discretion of the district court. *Id.* at 609–10. But we found *Simcox* to be "a close question," and weighed the "serious nature of the abuse, the extreme frequency with which it occurred, and the reasonable likelihood that it will occur again absent sufficient protection." *Id.* at 609. As noted above, Chief Judge Oliver found that the frequency and severity of violence to Monasky were unclear, and that there was no evidence that violence was ever directed at A.M.T.

This is not to say that a child who is not herself subject to physical abuse is never in grave risk of psychological harm or of being placed in an "intolerable situation."

Amici argue that A.M.T. was both a direct and indirect victim of physical domestic abuse in utero; that her exposure to domestic violence as an infant creates a grave risk of harm; that Taglieri's history of abusive behavior makes it more likely that he will engage in abusive behavior in the future creating an intolerable situation for A.M.T.; that a pattern of abuse and neglect of A.M.T. creates a grave risk of physical and psychological harm to A.M.T. and places her in an intolerable situation; and that A.M.T.'s separation from her supportive parent, Monasky, further perpetuates the abuse and increases the grave risk of physical harm. But we must acknowledge that the facts before us, while demonstrating that Taglieri has engaged in appalling and justly censurable activity, do not "show that the risk to the child is grave, not merely serious." *Friedrich II*, 78 F.3d at 1068 (quoting Public Notice 957, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986)). As a result, Monasky has failed to meet her burden to show by clear and convincing evidence that a grave risk of harm to A.M.T. exists or that there is a grave risk that A.M.T. would be placed in an intolerable situation.

### III

The foundation of our test for determining habitual residence has always been the experiences of the child. With regard to determining A.M.T.'s experiences here, "[t]his is a simple case." *Friedrich I*, 983 F.2d at 1402. Having spent her entire life in Italy, it is appropriate to hold that her habitual residence was Italy. Accordingly, we AFFIRM the district court's decision to grant Taglieri's petition to return A.M.T. to her country of habitual residence, Italy.

KAREN NELSON MOORE, Circuit Judge, dissenting.

The Hague Convention's admirable goal is to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Convention on the Civil Aspects of International Child Abduction (1980). The key question in this Hague Convention case is: Where is A.M.T.'s habitual residence, if one exists at all? The majority recharacterizes our prior decisions on this issue and, in doing so, alters the standards we have used to determine a child's habitual residence under the Hague Convention. Because I believe that the majority's analysis in this case distorts our precedent, I respectfully dissent.

### A.

"The question of which standard should be applied in determining a child's habitual residence under the Hague Convention is one of law, and is reviewed *de novo* by this Court." *Robert v. Tesson*, 507 F.3d 981, 987 (6th Cir. 2007). The determination of habitual residence, on the other hand, "is one of fact, and is reviewed for abuse of discretion." *Id.* at 995. Pursuant to the Hague Convention, "the petitioner must prove by a preponderance of the evidence that the children who are the subject of the petition were removed from their habitual residence." *Id.* (citing *Friedrich v. Friedrich (Friedrich I )*, 983 F.2d 1396, 1400 (6th Cir. 1993)).

### B.

We first addressed the question of habitual residence in *Friedrich I*, 983 F.2d 1396. In that case, we articulated "five principles which guide this Court" in determining a child's habitual residence." *Robert*, 507 F.3d at 989. First, habitual residence should not be determined on the basis of technical rules. *Friedrich I*, 983

F.2d at 1401. *Friedrich I* instead said that "[t]he facts and circumstances of each case should ... be assessed without resort to presumptions or presuppositions." *Id.* (quoting *In Re Bates,* No. CA 122.89, High Court of Justice, Family Div'n Ct., Royal Court of Justice, United Kingdom (1989)). Second, "the court must focus on the child, not the parents" and evaluate the child's experience. *Id.* Third, an inquiry into a child's habitual residence must "examine past experience, not future intentions." *Id.* Fourth, an individual "can have only one habitual residence." *Id.* Finally, the parents' nationality does not affect the child's habitual residence, but rather the habitual residence is controlled by "geography and the passage of time." *Id.* at 1401–02.

The principles elucidated by *Friedrich I* worked well in that case, where the child had lived exclusively in Germany for two years after he was born, but we recognized that the case provided minimal guidance in other situations. *Robert,* 507 F.3d at 992. Thus, in *Robert,* we adopted an approach developed by other circuits, which we found was "consistent with *Friedrich I*'s holding." 507 F.3d at 993. In *Robert,* we held "that a child's habitual residence is the nation where, at the time of their removal, the child has been present long enough to allow acclimatization, and where this presence has a 'degree of settled purpose from the child's perspective.'" *Id.* (quoting *Feder v. Evans-Feder,* 63 F.3d 217, 224 (3d Cir. 1995)). In adopting this "acclimatization standard," however, we recognized that it would prove difficult to apply in a case involving "a very young or developmentally disabled child [who] may lack cognizance of their surroundings sufficient to become acclimatized to a particular country or to develop a sense of settled purpose" and left open the question of what standard to apply in such a situation. *Robert,* 507 F.3d at 992 n.4. In *Simcox v. Simcox,* 511 F.3d 594 (6th Cir. 2007), de-

cided shortly after *Robert,* we reaffirmed that the acclimatization standard was the appropriate test to utilize when determining a child's residency, but recognized that "this standard may not be appropriate in cases involving infants or other very young children." 511 F.3d at 602 & n.2.

In our recent decision in *Ahmed v. Ahmed,* 867 F.3d 682 (6th Cir. 2017), we reached the question left open by *Robert* and *Simcox* and addressed the issue of determining habitual residence for infants who are not old enough to have developed "a sense of settled purpose." Because the facts and analysis in that case mirror the case at bar, I will discuss *Ahmed* in detail.

Mr. and Mrs. Ahmed married in 2009 while Mr. Ahmed, a U.K. citizen, lived in London and Mrs. Ahmed, a U.S. citizen, lived in Michigan. *Ahmed,* 867 F.3d at 684. After Mrs. Ahmed finished her optometry studies in the United States, she moved to London to live with her husband. Upon her arrival in 2011, she sought to become a licensed optometrist in the United Kingdom and received the U.K. equivalent of a Social Security Number. *Id.* at 685. Mrs. Ahmed then returned to the United States for further optometry training. Subsequently, in 2013, Mrs. Ahmed rejoined her husband in the United Kingdom; she intended for this to be a permanent move and applied for Indefinite Leave to Remain in the United Kingdom. Following Mrs. Ahmed's return to the United Kingdom, the couple's relationship grew acrimonious. In February 2014, Mrs. Ahmed became pregnant with twins. Following "a bitter argument" in May 2014, she returned to the United States. *Id.* The couple disputed whether or not Mrs. Ahmed planned to return, but Mrs. Ahmed claimed she did not, and brought her valuables back to the United States. Mr. Ahmed traveled to the United States on a three-month visa in order to be present at

the birth of the couple's twins. When his visa expired, Mr. Ahmed returned to the United Kingdom. In May 2015, the whole family journeyed to the United Kingdom. Mr. Ahmed asserted that this was a permanent relocation; in contrast, Mrs. Ahmed claimed that this was a short visit to determine whether her marriage was still viable. In August 2015, Mrs. Ahmed returned to the United States with her children via Bangladesh. *Id.* at 686. Mr. Ahmed subsequently filed a petition in the Eastern District of Tennessee to return the twins under the Hague Convention. The district court denied Mr. Ahmed's petition.

In our subsequent decision affirming the district court's denial of Mr. Ahmed's petition, we extensively discussed our prior cases analyzing the Hague Convention. We began by stating that "[w]e have generally preferred the acclimatization standard because it serves one of the main purposes of the Hague Convention: ensuring a child is not kept from her family and social environment." *Id.* at 688. We noted, however, that there was a "gap" in our precedent "concerning especially young children." *Id.* at 689. Consequently, we discussed the reasons for adopting a different standard for determining habitual residence for infants than for older children. First, "[t]he most compelling reason for applying the settled mutual intent standard is the difficulty, if not impossibility, of applying the acclimatization standard to especially young children." *Id.* Furthermore, we noted the persuasive authority of other circuits: "Every circuit to have determined

whether a country constituted a habitual residence considers both the acclimatization and shared parental intent standards. ... And all but the Fourth and Eighth Circuits prioritize shared parental intent in cases concerning especially young children." *Id.* at '689–90 (collecting cases in which the First, Second, Third, Fourth, Fifth, Seventh, Eighth, Ninth, Tenth, and Eleventh circuits utilize the shared-parental-intent standard). Based on these reasons, we concluded that:

> [I]t is appropriate to consider the shared parental intent of the parties in cases involving especially young children who lack the cognizance to acclimate to any residence. This is not a bright-line rule, and the determination of when the acclimatization standard is impracticable must largely be made by the lower courts, which are best positioned to discern the unique facts and circumstances of each case. We make no changes to the acclimatization standard itself, which lower courts should continue to apply in accordance with our precedent.

*Id.* at 690 (citations omitted).[1]

Applying this newly clarified analysis to the Ahmeds' situation, we first began with the acclimatization standard as articulated in *Simcox*: "[A] court should consider whether the child has been 'physically present [in the country] for an amount of time sufficient for acclimatization' and whether the place 'has a degree of settled purpose from the child's perspective.'" *Simcox*, 511 F.3d at 602 (second alteration in original) (quoting *Robert*, 507 F.3d at 989). We concluded that the Ahmed

---

1. *Ahmed* did not discuss whether the shared-parental-intent standard should apply to "developmentally disabled child[ren who] may lack cognizance of their surroundings sufficient to become acclimatized to a particular country or to develop a sense of settled purpose." *Robert*, 507 F.3d at 992 n.4. This issue is not presented here, but I believe that the

reasoning in *Ahmed* as to why the shared-parental-intent standard is appropriate in determining the habitual residence of a very young child is equally applicable to a child who, despite her biological age, is so significantly developmentally disabled that her level of consciousness of her surroundings is equal to that of an infant.

twins—who were less than a year old when they traveled from the United Kingdom to the United States in August 2015—were unable to have acquired a "degree of settled purpose." *Ahmed*, 867 F.3d at 690. Therefore, "[t]he conclusion that the acclimatization standard is unworkable with children this young then requires consideration of any shared parental intent to determine if Mr. Ahmed has shown that the United Kingdom was the children's habitual residence when they were retained." *Id.* After reviewing the district court's findings of fact, we held that the district court was not clearly erroneous when it found that the Ahmeds lacked a shared intent as to their children's residence. *Id.* Mr. Ahmed, therefore, "failed to carry his burden under the shared parental intent standard." *Id.* Because Mr. Ahmed could not "prove[ ] by a preponderance of evidence, under either standard, that the United Kingdom was the children's habitual residence when Mrs. Ahmed traveled with them to the United States," we affirmed the district court's denial of his petition. *Id.* at 691.

### C.

The majority today holds that A.M.T.'s habitual residence was Italy, the country from which she was taken. Maj. Op. at 877. It reaches that erroneous result by adopting a formalistic, rigid, bright-line rule that a child's habitual residence is her country of birth if she has exclusively resided in that country. Maj. Op. at 876. This conclusion is in contravention of *Friedrich I*'s admonition that residence should not be determined on the basis of bright-line rules and instead "[t]he facts and circumstances of each case should ... be assessed without resort to presumptions or presuppositions." *Friedrich I*, 983 F.2d at 1401 (internal quotation marks omitted). Furthermore, the majority claims that its bright-line rule is one of "three distinct

standards" that our caselaw has developed to determine a child's habitual residence. Maj. Op. at 876. This characterization distorts our prior precedent which has articulated two standards. "We have generally preferred the acclimatization standard," but when that standard is unworkable, we have applied the shared-parental-intent standard. *Ahmed*, 867 F.3d at 688–90; *see also Simcox*, 511 F.3d at 602 (applying the acclimatization standard, but recognizing another standard may need to be used for children incapable of forming a degree of settled purpose); *Robert*, 507 F.3d at 992–93 (same). *Friedrich I* provides a further set of principles that we use when considering the specific facts and circumstances of each case within the framework of the applicable standard. Simply, our prior precedent does not support the majority's approach in this case.

### D.

Our analysis in *Ahmed* compels the result in this case. First, it is clear that the acclimatization standard is not "workable" in this situation. Here, A.M.T. resided in Italy for only eight weeks, from her birth in February 2015 until Monasky returned with her to the United States in April 2015. R. 70 (Dist. Ct. Op. at 1, 8) (Page ID #1865, 1872). We concluded that the eight-month-old twins in *Ahmed* were unable to have a "degree of settled purpose" anywhere due to their age. *Ahmed*, 867 F.3d at 690. Consequently, A.M.T.—an eight-week-old newborn—must also be too young to have developed a "degree of settled purpose" and acclimatized to Italy. Thus, following the analysis in *Ahmed*, because we cannot answer whether Italy is A.M.T.'s habitual residence under the acclimatization standard, we must then turn to the shared-parental-intent standard. *Id.* at 690. If the parties have no shared intent, then the child has no habitual resi-

dence. *See Delvoye v. Lee*, 329 F.3d 330, 333 (3d Cir. 2003) ("[W]here the conflict [in a marriage] is contemporaneous with the birth of the child, no habitual residence may ever come into existence.").

The district court did consider the lack of shared intent to be relevant to its determination of A.M.T.'s habitual residence. R. 70 (Dist. Ct. Op. at 21) (Page ID #1885). It did so, however, without the guidance of our decision in *Ahmed*, and consequently its analysis does not comport with the correct legal standard. The district court incorrectly focused on Monasky's lack of definitive plans to leave Italy immediately—she was waiting until A.M.T.'s passport was issued—and whether or not Monasky and Taglieri had established a marital home in Italy.[2] *Id.* at 21–22 (Page ID #1885–86). What matters, however, under the shared-parental intent standard is where the parents "intended the children to live." *Ahmed*, 867 F.3d at 690; *cf. Holder v. Holder*, 392 F.3d 1009, 1016–17 (9th Cir. 2004) ("In analyzing ... [the parents'] intent, we do not lose sight of the fundamental inquiry: the *children's* habitual residence. Parental intent acts as a surrogate for that of children who have not yet reached a stage in their development where they are deemed capable of making autonomous decisions as to their residence." (emphasis in original)). Furthermore, because the petitioner-parent has the burden of proof, if the shared intent is "either unclear or absent," the petitioner necessarily has not met his or her burden. *Ahmed*, 867 F.3d at 691.

Here, the district court's findings of fact indicate that Taglieri has failed to satisfy his burden of proof under the shared-parental-intent standard as elucidated in *Ahmed*. The district court found that the parties' marriage "during the time surrounding the birth of their daughter was fraught with difficulty." R. 70 (Dist. Ct. Op. at 17–18) (Page ID #1881–82). In the months before and after A.M.T.'s birth, Taglieri subjected Monasky to physical and sexual abuse. *Id.* at 27–28 (Page ID #1891–92). During her pregnancy, Mona-

**2.** The district court stated that: "Assuming that the Sixth Circuit would hold that the shared intent of the parties is relevant in determining the habitual residence of an infant child, the court finds that such inquiry in this case would begin with determining whether there is a marital home where the child has resided with his parents." R. 70 (Dist. Ct. Op. at 21) (Page ID #1885). The district court's conclusion, however, that the parties had established a marital home in Italy appears to have been not only the first inquiry in its analysis, but also the overriding factor in its decision. *Id.* at 20–21 (Page ID #1885–86). But while the existence of a marital home may be evidence of a shared-parental intent for the child to be raised in that locale, it is not dispositive. *See Redmond v. Redmond*, 724 F.3d 729, 732 (7th Cir. 2013) ("The determination of habitual residence under the Hague Convention is a practical, flexible, factual inquiry that accounts for all available relevant evidence and considers the individual circumstances of each case."); *Holder v. Holder*, 392 F.3d 1009, 1015 (9th Cir. 2004) (explaining that the Hague Convention intended for the inquiry into habitual residence to be "flexible" and "fact-specific" (citing Paul R. Beaumont & Peter E. McEleavy, *The Hague Convention on International Child Abduction* 89 (1999))). Consider, for example, a hypothetical childless couple who have established a marital home in Country A. They both live and work in Country A and it is their shared intent to continue maintaining their marital home there. After the wife conceives a child, the couple forms a shared parental intent to raise the child in Country B, where the wife's family lives and can provide support. Following the birth of the child, the wife travels to Country B with the newborn to raise the child there. The spouses plan, however, for the wife and child to return frequently to Country A for vacations and for the wife to resume habitation in the marital home after the child is an adult. In this situation, the existence of the marital home in Country A at the time of the child's birth does not affect the shared parental intent to raise the child in Country B.

sky began "applying for jobs in the United States, inquiring about American health care and child care options, and looking for American divorce lawyers." *Id.* at 3–4 (Page ID #1867–68). She obtained "quotes from international moving companies regarding a move from Italy to the United States," *id.* at 5 (Page ID #1869), and repeatedly indicated that she wanted to divorce Taglieri and return to the United States with A.M.T. *Id* at 6–7 (Page ID #1870–71). During the bench trial, Taglieri vigorously disputed the inferences that could be drawn from these actions and pointed to other conduct—such as searching for an *au pair* for A.M.T. and scheduling medical appointments—that suggest the parties' shared intent was for Italy to be A.M.T.'s habitual residence. *See, e.g., id.* at 4, 6–7 (Page ID #1868, 1870–71). All of these findings suggest that Monasky's and Taglieri's plans for A.M.T.'s upbringing did not "converge." *Ahmed,* 867 F.3d at 691 (holding that a "couple's settled intent to live in the United Kingdom" prior to the wife's pregnancy did not mean that the couple had a shared parental intent to raise their children in that country, because the evidence demonstrated that the couple had divergent plans regarding their twins' residence starting from when the children were in utero); *see also Berezowsky v. Ojeda,* 765 F.3d 456, 468–69 (5th Cir. 2014) ("A shared parental intent requires that the parents actually *share* or jointly develop the intention. In other words, the parents must reach some sort of meeting of the minds regarding their child's habitual residence, so that they are making the decision together.").

Because the district court did not have the benefit of our decision in *Ahmed* when applying the shared-parental-intent standard, but rather had to hypothesize about the content of this standard, I would reverse and remand this case so that the district court can conduct its factfinding utilizing the correct legal analysis as articulated in *Ahmed. See Brumley v. Albert E. Brumley & Sons, Inc.,* 727 F.3d 574, 577 (6th Cir. 2013) ("Reversal is appropriate when the trial court applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." (internal quotation marks omitted)); *Siding & Insulation Co. v. Alco Vending, Inc.,* 822 F.3d 886, 901 (6th Cir. 2016) ("[A] remand is required for the district court to apply the correct legal standard.").

### E.

This is a deeply troubling case, as Hague Convention cases often are. And I must respectfully disagree with my colleagues' failure to follow binding Circuit precedent. This is "a simple case," Maj. Op. at 879, because our decision in *Ahmed* compels the outcome in this case. Our acclimatization standard is sufficient to determine the habitual residence of most children, and when it is not, we must then use the settled-parental-intent standard. Where the child is too young to have acclimatized to her community and surroundings, and where the parents do not have a settled mutual intent, I would conclude that the child cannot have a habitual residence. I would therefore reverse the judgment of the district court and remand so that the district court, in accordance with the correct legal standard as explained in this opinion and *Ahmed,* can determine whether Taglieri demonstrated by a preponderance of the evidence that a shared parental intent for A.M.T. to reside habitually in Italy existed.