RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0183p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

FAISAL AHMED,

*Petitioner-Appellant,*

No. 16-6486

*v.*

MARDIA MOHSIN AHMED,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:16-cv-00142—Thomas W. Phillips, District Judge.

Argued: June 15, 2017

Decided and Filed: August 16, 2017

Before: COLE, Chief Judge; GIBBONS and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** John T. Winemiller, MERCHANT & GOULD P.C., Knoxville, Tennessee, for Appellant. Linda Shay Gardner, GARDNER LAW OFFICE, Bethlehem, Pennsylvania, for Appellee. **ON BRIEF:** John T. Winemiller, R. Bradford Brittian, MERCHANT & GOULD P.C., Knoxville, Tennessee, for Appellant. Linda Shay Gardner, GARDNER LAW OFFICE, Bethlehem, Pennsylvania, for Appellee.

COLE, C.J., delivered the opinion of the court in which ROGERS, J., joined, and GIBBONS, J., joined in the result. GIBBONS, J. (pp. 13–14), delivered a separate opinion concurring in the judgment.

_____

## OPINION

_____

COLE, Chief Judge.  This is an action under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), which the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*, has implemented into United States law.  Faisal Ahmed claims that his wife, Mardia Mohsin Ahmed wrongfully retained their daughters in Knoxville, Tennessee, from the infants' habitual residence of the United Kingdom.[1] Mr. Ahmed filed a petition for their return.  Because Mr. Ahmed has failed to establish that the United Kingdom was the children's habitual residence at the time Mrs. Ahmed retained them, we affirm the district court's denial of his petition.

## I.  FACTS AND PROCEDURAL HISTORY

Mr. Ahmed is a citizen of the United Kingdom and resides in London.  Mrs. Ahmed is a United States citizen and resides in Knoxville, Tennessee.

The couple married in Bangladesh in December 2009.  At the time, Mr. Ahmed lived in London and Mrs. Ahmed was an optometry student in Michigan.  After the wedding, Mrs. Ahmed remained in Michigan to complete her studies.  Mr. Ahmed visited periodically from London.

In August 2011, Mrs. Ahmed moved to London to live with her husband.  She obtained a visa, began working, and took steps to become licensed to practice optometry in the United Kingdom.  That September, Mrs. Ahmed received a National Insurance Number (the equivalent of a Social Security Number).

---

[1]This is a wrongful retention rather than a wrongful removal case because Mr. Ahmed claims his wife is keeping their children without his consent, but not that she took them without his consent.  *See Feder v. Evans-Feder*, 63 F.3d 217, 220 n.4 (3d Cir. 1995).  As discussed below, Mr. Ahmed consented to Mrs. Ahmed taking the children to a wedding in Bangladesh, but objected to their remaining in the United States afterwards.

Mrs. Ahmed returned to the United States in December 2011 for additional training needed to practice optometry in the United Kingdom.  Mr. Ahmed again visited Mrs. Ahmed in the United States periodically.

Mrs. Ahmed did not return to London until August 2013, which she considered a permanent move.  That October she applied for Indefinite Leave to Remain ("ILR") in the United Kingdom, stating in the application that she had considered London her permanent home for the previous two years.  Mrs. Ahmed received her ILR the next year.

By all accounts, the couple's relationship grew rancorous during this period, exacerbated, the parties say, by Mrs. Ahmed's professional challenges, two miscarriages, and the interference of both sets of in-laws.

In February 2014, Mrs. Ahmed became pregnant again and was put on bed rest by her doctor for months.  In April, she registered for an exam required to practice optometry in the United Kingdom.

The couple had a bitter argument in May 2014, of which they offer conflicting accounts. Mrs. Ahmed then traveled to Knoxville, where she had lived previously.  The couple disputes whether Mrs. Ahmed intended to return to the United Kingdom.  Mrs. Ahmed maintains she did not plan to return, noting that she took her optometry instruments and other valuables with her to the United States.  Mr. Ahmed maintains he expected her to return in as little as a month.  Mrs. Ahmed contends that she did not return to the United Kingdom because of her high-risk pregnancy and the acrimony in her marriage.

Mr. Ahmed traveled to Knoxville in October 2014 on a three-month visa in anticipation of the birth of their children.  That November, Mrs. Ahmed gave birth to twins in Knoxville. After a few days, the family moved into a local apartment, where Mr. Ahmed cared for the children as his wife recovered from childbirth.

In January 2015, Mr. Ahmed's visa expired and he returned to London.  Mrs. Ahmed insists she told Mr. Ahmed then that she intended to remain in the United States with the children

indefinitely. Mrs. Ahmed moved with the children to her parents' home in Knoxville, where they live today. The children received medical care in Knoxville from birth until May 2015.

Mr. Ahmed returned to the United States in April 2015. The next month, the entire family traveled to the United Kingdom. Once there, they moved into Mr. Ahmed's parents' home for one or two months. The couple disputes whether Mrs. Ahmed considered the relocation to the United Kingdom permanent. Mrs. Ahmed asserts that she left Knoxville "for a short summer visit" "to see if [their] marriage was going to work." (Hr'g Tr. 2, R. 27, PageID 213, 216; *see also id.* at 283–84.) Mr. Ahmed believed this to be a permanent move.

Indeed, Mrs. Ahmed traveled on a round-trip ticket with a return scheduled for November 2015. But the couple agrees this was partly so she could attend a professional conference in the United States. As United States citizens, the children traveled on a ninety-day visa.

Further, Mrs. Ahmed states she left her valuables in Knoxville, including her optometry instruments, jewelry and diplomas. Mr. Ahmed insists that his wife took nearly everything important to London.

Mrs. Ahmed's friend testified that Mrs. Ahmed planned to return to Knoxville to live, and the children's medical records from May 2015 reflect appointments for that fall. Moreover, Mrs. Ahmed did not sell her car or cancel her auto insurance in the United States, retained American medical insurance for herself and the children, renewed her Tennessee optometry license and professional liability insurance, and paid her Tennessee professional privilege tax before leaving for London.

Once in London, however, Mrs. Ahmed took the exam required to practice optometry in the United Kingdom. She also registered the children with the National Health Service and took them for a check-up in London.

In July 2015, Mrs. Ahmed traveled with the children to a wedding in Bangladesh. Their tickets indicated they were scheduled to return to London on August 5. But the couple disputes whether Mrs. Ahmed actually intended to do so. Mrs. Ahmed claims she told her husband upon

leaving London that she would not return.  Mr. Ahmed claims he did not learn her plans until August 4, when she flew to Knoxville with the children.

Mr. Ahmed submitted an application to the United Kingdom Central Authority on August 10, 2015, for the return of the children under the Hague Convention.  The application was forwarded to the United States Department of State ("State Department") and National Center for Missing and Exploited Children.  On August 28, the State Department asked Mrs. Ahmed to return the children to the United Kingdom voluntarily.  She declined.

In March 2016, Mr. Ahmed filed this action in the district court.  That April, the couple stipulated to a temporary restraining order prohibiting Mrs. Ahmed from removing the children from the Eastern District of Tennessee pending a hearing on the merits of the case.  In June, the district court held a two-day hearing on the merits, during which each party presented live testimony and numerous exhibits.  The district court denied Mr. Ahmed's petition for return.

## II.  ANALYSIS

### A.  Standards of Review

"The question of which standard should be applied in determining a child's habitual residence under the Hague Convention is one of law, and is reviewed de novo by this Court." *Robert v. Tesson*, 507 F.3d 981, 987 (6th Cir. 2007).  But the determination of habitual residence is "one of fact, and is reviewed for abuse of discretion."  *Id*. at 995.  We review, however, underlying legal conclusions de novo and factual findings for clear error.  *Simcox v. Simcox*, 511 F.3d 594, 601 (6th Cir. 2007).  "Under the clear-error standard, we abide by the court's findings of fact unless the record leaves us with the definite and firm conviction that a mistake has been committed."  *United States v. Yancy*, 725 F.3d 596, 598 (6th Cir. 2013) (internal quotation marks and citation omitted).

Under the ICARA, a petitioner seeking the return of a child under the Hague Convention must prove by a preponderance of evidence that the child was wrongfully retained or removed from her habitual residence.  *March v. Levine*, 249 F.3d 462, 465–66 (6th Cir. 2001); *see* 22 U.S.C. § 9003(e)(1).

**B. Hague Convention**

Countries have adopted the Hague Convention to "protect children internationally from the harmful effects of their wrongful removal or retention and to . . . ensure their prompt return to the State of their habitual residence." *March*, 249 F.3d at 465 (quoting the Convention's preamble). The goal is to prevent a child from being "taken out of the family and social environment in which its life has developed." *Robert*, 507 F.3d at 991–92 (quoting the official commentary on the Hague Convention). The Hague Convention is also meant to deter parents from crossing borders in search of more favorable forums. *Friedrich v. Friedrich,* 78 F.3d 1060, 1064 (6th Cir. 1996) ("*Friedrich II*").

"[A] court in the abducted-to nation has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute." *Id.* at 1063 (citing § 9003(b)(4)). If the petitioning party shows that the Hague Convention requires return to the abducted-from nation, the child is returned there to determine custody (unless the respondent establishes certain defenses, none of which are alleged here). *Id.* at 1067.

The Hague Convention requires return when the petitioner shows that the respondent wrongfully retained or removed the child in breach of the petitioner's custody rights in the child's habitual residence before retention or removal. *March*, 249 F.3d at 465–66; *see Holder v. Holder*, 392 F.3d 1009, 1014–15 (9th Cir. 2004). Here, the only issue on appeal is whether Mr. Ahmed has shown by a preponderance of the evidence that Mrs. Ahmed wrongfully retained the children from their habitual residence, namely whether the United Kingdom was their habitual residence on August 4, when she traveled from Bangladesh to the United States.

**C. District Court Opinion**

As noted, the district court conducted a two-day evidentiary hearing and issued detailed factual findings that, for the most part, neither party disputes. The district court concluded that it was bound by circuit precedent to apply the "acclimatization standard" to determine the children's habitual residence under the Hague Convention. (Op., R. 31, PageID 709–10) (internal quotation marks omitted). *See Robert*, 507 F.3d at 993. Under this standard, "a court should consider whether the child has been physically present in the country for an amount of

time sufficient for acclimatization and whether the place has a degree of settled purpose from the child's perspective." *Simcox*, 511 F.3d at 602 (internal quotation marks and citations omitted). "[A]cademic activities" are "highly suggestive of acclimatization" and "social engagements, participation in sports programs and excursions, and meaningful connections with the people and places in the . . . country all point to the child being acclimatized." *Jenkins v. Jenkins*, 569 F.3d 549, 556 (6th Cir. 2009) (internal quotation marks and citation omitted); *see, e.g., Robert*, 507 F.3d at 996–97 (concluding that children had acclimated to a particular country by attending kindergarten, vacationing with certain family members, and visiting others there).

The district court acknowledged that we have rejected the "shared parental intent standard" in cases not involving "infants or other very young children," for whom, "[o]f course, [the acclimatization] standard may not be appropriate." (Op., R. 31, PageID 712–13) (internal quotation marks omitted). *Simcox*, 511 F.3d at 602 n.2. Pointedly, our circuit has noted that we have "no opinion on whether the habitual residence of a child who lacks cognizance of his or her surroundings should be determined by considering the subjective intentions of his or her parents." *Robert*, 507 F.3d at 992 n.4. By "subjective intentions," we mean the parents' last "settled mutual intent" for where their child would live. *Gitter v. Gitter*, 396 F.3d 124, 133, 135 (2d Cir. 2005) (internal quotation marks and citation omitted); *see also Nicolson v. Pappalardo*, 605 F.3d 100, 104 (1st Cir. 2010); *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995). The district court noted the reliance by courts on the shared parental intent standard in cases concerning especially young children. *See, e.g., Redmond v. Redmond*, 724 F.3d 729, 746 (7th Cir. 2013) (recognizing "'parental intent acts as a surrogate' in cases involving very young children for whom the concept of acclimatization has little meaning") (quoting *Holder*, 392 F.3d at 1016–17).

Unpersuaded that it could apply the shared parental intent standard, the district court applied the acclimatization standard. (Op., R. 31, PageID 714–15) (considering the twins' family contact and medical care in each country). Because the children were infants, however, its analysis boiled down to a simple comparison between the length of stay in each country—six months in the United States and seven to eight weeks in the United Kingdom. *See Simcox*, 511 F.3d at 602 ("A person can have only one habitual residence" at a time.). The district court

concluded the latter was insufficient to establish a habitual residence and thus denied Mr. Ahmed's petition. At the same time, the court noted the infants' inability to partake in "school, sports or other extra-curricular activities, or meaningful friendships." (Op., R. 31, PageID 715.)

The extent to which the district court applied the shared parental intent standard is less clear. (*Id.* at 721) (basing its legal conclusion that Mr. Ahmed failed to establish that the United Kingdom was the children's habitual residence on their "past experience" only, which goes to the acclimatization standard alone). Either way, the district court devoted most of its analysis to any shared parental intent between the Ahmeds and made factual findings under that standard. First, it determined that the Ahmeds mutually intended to live in the United Kingdom "in the fall of 2013," when Mrs. Ahmed applied for her ILR and before she became pregnant with the twins. (*Id.* at 716.) The court concluded this intent "was no longer shared by . . . the time [Mrs. Ahmed] traveled to the U.S. in May 2014." (*Id.*) (contrasting Mrs. Ahmed's testimony that she took her valuables with her with Mr. Ahmed's claim that he expected her to return in as little as a month). The court found it was "unclear at what point [Mrs. Ahmed's] intent changed" between the fall of 2013 and May of 2014, including after she became pregnant. (*Id.* at 716–17.) Finally, the court detected "no evidence that the parties' intent . . . ever became shared again." (*Id.* at 717–18) (recounting testimony by Mrs. Ahmed's friend that Mrs. Ahmed planned to return to Knoxville, the children's medical appointments in the United States for the fall of 2015, and Mrs. Ahmed's maintenance of her optometry license, professional liability insurance, medical insurance, and car insurance in the United States). In sum, the district court found "no settled mutual intent during the children's lives and much of Mrs. Ahmed's pregnancy." (*Id.* at 719.)

**D. Legal Standard in Cases Involving Especially Young Children**

The parties ask us to consider their settled mutual intent in disposing of Mr. Ahmed's petition. We must ask first whether precedent allows us to do so. It does.

We have generally preferred the acclimatization standard because it serves one of the main purposes of the Hague Convention: ensuring a child is not kept from her family and social environment. *See Robert*, 507 F.3d at 991–92 (regretting that in one case, the shared parental intent standard led to parents' plans for living in one country outweighing three years of their

children's residency and schooling in another). This ceases to be a concern, of course, if a child never forms such ties or is incapable of doing so. We have also said that, instead of relying on technical rules, we examine "the facts and circumstances of each case." *Id.* at 989 (internal quotation marks and citations omitted). To be sure, in *Friedrich v. Friedrich*, we "focus[ed] on the child, not the parents, and examine[d] past experience, not future intentions." 983 F.2d 1396, 1400 (6th Cir. 1993) ("*Friedrich I*").

As both *Simcox* and *Robert* have made clear, we did not reach the issue of especially young children in *Friedrich I*. *Id.* at 1398, 1401–02 (concerning a "simple case" in which the nearly two-year-old child "resided exclusively in Germany until his mother removed him to the United States"); *Simcox*, 511 F.3d at 602 n.2 ("Of course, th[e acclimatization] standard may not be appropriate in cases involving infants or other very young children.") (citing *Friedrich I*, 983 F.2d at 1401–02); *Robert*, 507 F.3d at 992 n.4 ("We . . . express no opinion on whether the habitual residence of a child who lacks cognizance of his or her surroundings should be determined by considering the subjective intentions of his or her parents."); *see also Panteleris v. Panteleris*, 601 F. App'x 345, 350 (6th Cir. 2015) (noting *Robert* excluded especially young children, leaving the legal standard in that scenario an open question). Consequently, incorporating the shared parental intent standard in cases concerning especially young children would mean addressing a gap, not overturning precedent. Having decided we *may* do so, we proceed to do so for the following reasons.

The most compelling reason for applying the settled mutual intent standard is the difficulty, if not impossibility, of applying the acclimatization standard to especially young children. The period a child spends in a given location is but one component of acclimatization. Not only must the child have "been present long enough," but he or she must have developed a "degree of settled purpose [there] from [her own] perspective." *Jenkins*, 569 F.3d at 556 (internal quotation marks and citation omitted). Thus, we regard "meaningful connections with the people and places" in a country, including "academic activities," "social engagements," and "sports programs," as evidence of acclimatization. *Robert*, 507 F.3d at 996 (internal quotation marks and citations omitted). In other words, what a child does in a country and how she feels about it are as important as the length of her stay there. As a result, virtually all children who

lack cognizance of their surroundings are *unable* to acclimate, making the standard generally unworkable.

Applying the shared parental intent standard in cases involving especially young children is consistent with the law of our sister circuits. Every circuit to have determined whether a country constituted a habitual residence considers both the acclimatization and shared parental intent standards. *See, e.g.*, *Mauvais v. Herisse*, 772 F.3d 6, 11 (1st Cir. 2014); *Guzzo v. Cristofano*, 719 F.3d 100, 110 (2d Cir. 2013); *Karkkainen v. Kovalchuk*, 445 F.3d 280, 296 (3d Cir. 2006); *Maxwell v. Maxwell*, 588 F.3d 245, 253 (4th Cir. 2009); *Larbie v. Larbie*, 690 F.3d 295, 310 (5th Cir. 2012); *Redmond*, 724 F.3d at 746; *Barzilay v. Barzilay*, 600 F.3d 912, 918 (8th Cir. 2010); *Holder*, 392 F.3d at 1020; *Kanth v. Kanth*, No. 99-4246, 2000 WL 1644099, at *1–2 (10th Cir. Nov. 2, 2000); *Chafin v. Chafin*, 742 F.3d 934, 938–39 (11th Cir. 2013) (per curiam). And all but the Fourth and Eighth Circuits prioritize shared parental intent in cases concerning especially young children. *See, e.g.*, *Mauvais*, 772 F.3d at 12; *Guzzo*, 719 F.3d at 110; *Karkkainen*, 445 F.3d at 296; *Larbie*, 690 F.3d at 310; *Redmond*, 724 F.3d at 746; *Holder*, 392 F.3d at 1020–21; *Kanth*, 2000 WL 1644099, at *1–2; *Chafin*, 742 F.3d at 938 n.9.

While we are of course free to diverge, we "routinely look[] to the majority position of other Circuits in resolving undecided issues of law" and value "harmony among the Circuits." *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 278 (6th Cir. 2010) (internal quotation marks and citations omitted) (recognizing the interest prospective parties have in the uniformity and predictability of results among the circuits).

For these reasons, it is appropriate to consider the shared parental intent of the parties in cases involving especially young children who lack the cognizance to acclimate to any residence. This is not a bright-line rule, and the determination of when the acclimatization standard is impracticable must largely be made by the lower courts, which are best positioned to discern the unique facts and circumstances of each case. *See Robert*, 507 F.3d at 989; *see also Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001) (describing the habitual residence analysis as "a fact-specific inquiry that should be made on a case-by-case basis"). We make no changes to the acclimatization standard itself, which lower courts should continue to apply in accordance with our precedent.

**E.  Review of District Court's Habitual Residence Determination**

Beginning with the acclimatization standard, the district court properly found that the twins' seven-to-eight-week stay in the United Kingdom hardly allowed them to acquire a "degree of settled purpose" there.  *Simcox*, 511 F.3d at 602 (internal quotation marks and citation omitted).  As infants, they were *unable* to do so anywhere when Mrs. Ahmed traveled with them to the United States in August of 2015.  The conclusion that the acclimatization standard is unworkable with children this young then requires consideration of any shared parental intent to determine if Mr. Ahmed has shown that the United Kingdom was the children's habitual residence when they were retained.

The district court's well-supported factual findings show that Mr. Ahmed has failed to carry his burden under the shared parental intent standard.  He relies on the court's finding of the couple's settled mutual intent to live in the United Kingdom in the fall of 2013, before the twins were conceived.  (*See* Op., R. 31, PageID 716) (citing Mrs. Ahmed's ILR application and efforts to become licensed to practice optometry in the United Kingdom).  But what matters is where the Ahmeds intended the children to live.  *Nicolson*, 605 F.3d at 104; *Gitter*, 396 F.3d at 133, 135; *Feder*, 63 F.3d at 224.  There is no error—and certainly no clear error—in the district court's findings of fact as to the Ahmeds' lack of shared intent as to their children's residence.

Further, the district court reasonably found the Ahmeds' intent was "unclear" between February 2014, when Mrs. Ahmed became pregnant, and May 2014, when she decided to return to the United States.  (Op., R. 31, PageID 716–17) (contrasting Mrs. Ahmed's testimony that she took her valuables with her with Mr. Ahmed's claim that he expected her to return in as little as a month).  The record indicates that the couple's relationship had deteriorated by February 2014 given Mrs. Ahmed's professional challenges, the two miscarriages, and the interference of the Ahmeds' in-laws.

Finally, the court rightly detected no evidence that the Ahmeds' plans ever converged after the fall of 2013.  (*Id.* at 717–18) (recounting testimony by Mrs. Ahmed's friend that Mrs. Ahmed planned to return to Knoxville, the children's medical appointments in the United States

for the fall of 2015, and Mrs. Ahmed's maintenance of her optometry license, professional liability insurance, medical insurance, and automobile insurance in the United States).

In sum, the district court's detailed factual findings establish that the Ahmeds' mutual intent for where their children would live was either unclear or absent from the time the children were conceived until Mrs. Ahmed retained them. Accordingly, Mr. Ahmed has not proven by a preponderance of evidence, under either standard, that the United Kingdom was the children's habitual residence when Mrs. Ahmed traveled with them to the United States in August of 2015.

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of the petition.

---

**CONCURRENCE**

---

JULIA SMITH GIBBONS, Circuit Judge, concurring in the judgment.  I agree that we must affirm the district court because Mr. Ahmed cannot establish, by a preponderance of the evidence, that the United Kingdom was the children's habitual residence.  And I agree that our precedent keeps open the possibility of considering shared parental intent in cases involving especially young children.  However, we need not adopt and apply such a standard in this case.

The district court recognized that evaluating acclimatization was not easy, noting that the Ahmed children were too young to examine the impact of school, sports, extra-curricular activities, or meaningful friendships.  The court, however, went on to conclude that the children received adequate medical care in both countries, had "ample clothes, toys, and the other material necessities of infant and toddler care" in both countries, and that there was a network of familial support in both countries.  DE 31, D. Ct. Op., Page ID 715.  Finding these factors to be equal, the court looked to the amount of time that the children spent in each country—which weighed in Mrs. Ahmed's favor—and held that Mr. Ahmed could not establish that the United Kingdom was the children's habitual residence.

This should be enough to resolve the case under the acclimatization test.  We have said that the acclimatization test is fact and circumstance specific.  *See Robert v. Tesson*, 507 F.3d 981, 987 (6th Cir. 2007).  And we prefer this standard because it ensures a child remains with her family and social environment.  *Id.* at 991–92.  We do our best to focus on the child and her past experiences, not the parents and their future intentions.  *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993).  Here, the district court's findings are focused on the family and social environment in each location.  Faced with a situation involving young children who were not enrolled in schools, sports, or activities, the court instead looked to the children's access to material possessions, healthcare, and family members.  It also looked to the amount of time the children spent in each location.  I believe that these factors are indicative of where the Ahmed children had established a family and social environment, where they had "meaningful

connections with people and places," *see Robert*, 507 F.3d at 996, even if the children could not yet communicate those connections to the court.

The majority asserts that a child who lacks cognizance of her surroundings is necessarily unable to acclimate, which makes the acclimatization standard "generally unworkable." Maj. Op. at 12. This likely stems from our prior holding that a habitual residence must have a "degree of settled purpose" from the perspective of the child. *Simcox v. Simcox*, 511 F.3d 594, 602 (6th Cir. 2007) (quoting *Robert*, 507 F.3d at 989). But it assumes, without support, that the Ahmed children were unable to recognize any benefit from their network of support and consistency of location.

Furthermore, as the majority recognizes, introducing parental intent as the basis for our analysis in the case of young children does not create a bright-line rule. It necessarily introduces a question that this court will eventually need to answer: How young must a child be for parental intent to matter? Opening the door to shared parental intent does not make the analysis any cleaner. If anything, it creates more fact-specific questions.

When faced with applying our current acclimatization test to account for young children and adopting a new test of shared intent, I would do the former. There may be a future case where, all other factors being equal, clear shared parental intent can play a role in determining the habitual residence of especially young children. This is not that case. Given the district court's findings as to acclimatization, it is enough to say that Mr. Ahmed has not met his burden to show, by a preponderance of the evidence, that his children were habitual residents of the United Kingdom.