SUTTON, Circuit Judge.
 

 Domenico Taglieri and Michelle Monasky were married. When the union fell apart, Monasky took A.M.T., their two-month-old daughter, from Italy to the United States. Taglieri filed a petition under the Hague Convention to return A.M.T. to Italy. The district court granted the petition after finding that Italy was A.M.T.'s country of habitual residence. Monasky appealed.
 

 Who wins turns on who decides. The Hague Convention places the child's habitual residence front and center in trying to achieve its goal of discouraging spouses from abducting the children of a once-united marriage. The Convention and our cases establish that the inquiry is one of fact. Judge Oliver held a four-day hearing about the point, after which he wrote a 30-page opinion that carefully and thoughtfully explained why Italy was A.M.T.'s habitual residence. No part of that decision goes awry legally, and no part of his habitual-residence finding sinks to clear error. We affirm.
 

 I.
 

 Taglieri, an Italian, and Monasky, an American, met in Illinois. Taglieri, who was already an M.D., was studying for his Ph.D. and worked with Monasky, who already had a Ph.D. They married in Illinois in 2011. Two years later, the couple moved to Italy to pursue their careers, with Taglieri arriving in February and Monasky arriving in July. At first, the couple lived in Milan, where they each found work-Taglieri as an anesthesiologist, Monasky as a research biologist. The marriage had problems, including physical abuse. Taglieri struck Monasky in the face in March 2014. After that, Monasky testified, he continued to slap her, making her increasingly afraid of him, and "forced himself upon [her] multiple times." R. 88-4 at 201.
 

 Monasky became pregnant with A.M.T. in May 2014, after one of the times Taglieri forced her to have sex, she claims. In June 2014, Taglieri took a job at a hospital in Lugo, about three hours from Milan. Monasky stayed in Milan, where she worked at a different hospital. Monasky had a difficult pregnancy, which, when combined with the long-distance separation, strained the relationship further. To make matters worse, she didn't speak Italian or have a valid driver's license, increasing her dependence on Taglieri for help with basic tasks. Monasky began investigating health care and child care options in the United States and looking for American divorce lawyers. But the couple also looked into child care options in Italy and prepared for A.M.T.'s arrival at the same time.
 

 In February 2015, Monasky emailed Taglieri about seeking a divorce and investigated a move back to the United States. The next day, Monasky and Taglieri went to the hospital in Milan for a pregnancy checkup. The doctors recommended that they induce labor. Monasky refused because she preferred a natural birth, upsetting Taglieri and prompting more verbal sparring. On the ride home from the hospital, Monasky asked Taglieri to turn the car around because she felt contractions. Taglieri refused. Back at their apartment, the arguments continued, with Taglieri calling her "the son of a devil." R. 88-4 at 113.
 

 Later that night, Monasky took a taxi to the hospital. Once Taglieri realized she had left, he went to the hospital and was there, along with Monasky's mother, during the labor and at A.M.T.'s birth by emergency cesarean section. After Monasky and A.M.T. left the hospital, Taglieri returned to Lugo, and Monasky stayed in Milan with A.M.T. and her mother.
 

 In March 2015, after Monasky's mother returned to the United States, Monasky told Taglieri that she wanted to divorce him and move to America. A few days later, however, Monasky left Milan to stay with Taglieri in Lugo. While Taglieri said he thought this would help them "clarify any existing issues," R. 88-1 at 39, Monasky said she went to Lugo because she couldn't recover from her cesarean section and take care of A.M.T. alone. Monasky and Taglieri dispute whether they reconciled in Lugo. Taglieri says they did. Monasky says they didn't. During this time, the two jointly initiated applications for Italian and American passports for A.M.T.
 

 In late March, Taglieri and Monasky had another argument. As the dispute escalated, Monasky slammed her hand on the table. Taglieri raised his hand as if he were going to hit her. But he didn't. He instead went into the kitchen. Monasky thought she heard Taglieri pick up a knife, but he came back into the room carrying ice cream. Soon after, Taglieri went to work and Monasky took A.M.T. to the police, seeking shelter in a safe house. She told the police that Taglieri was abusive. After Taglieri returned home and found
 his wife and daughter missing, he went to the police to revoke his permission for A.M.T.'s American passport. Two weeks later, Monasky left Italy for the United States, taking eight-week-old A.M.T. with her.
 

 Taglieri filed an action in Italian court to terminate Monasky's parental rights. The court ruled in Taglieri's favor ex parte. Then Taglieri filed a petition in the Northern District of Ohio seeking A.M.T.'s return under the Hague Convention. The district court granted Taglieri's petition. Monasky appealed. After this court and the United States Supreme Court denied her motion for a stay pending appeal, Monasky returned A.M.T. to Italy.
 

 On appeal, a divided panel of this court affirmed the district court.
 
 876 F.3d 868
 
 (2017). We granted Monasky's petition for rehearing en banc. No. 16-4128 (Mar. 2, 2018).
 

 II.
 

 Ninety-nine countries, including the United States and Italy, have signed the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89.
 
 See
 
 Status Table, HCCH, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last updated Sept. 12, 2018). The treaty addresses a pressing and never-ceasing policy problem-the abductions of children by one half of an unhappy couple. The Convention's mission is basic: to return children "to the State of their habitual residence," to require any custody disputes to be resolved in that country, and to discourage parents from taking matters into their own hands by abducting a child. Hague Convention pmbl.
 

 Federal law, namely the International Child Abduction Remedies Act, implements the Hague Convention and hews to the treaty's language.
 
 22 U.S.C. § 9001
 

 et seq
 
 . A parent may petition a federal or state court to return abducted children to their country of habitual residence.
 

 Id.
 

 § 9003(b). The federal or state court determines whether to return the child.
 

 Id.
 

 § 9001(b)(4). Courts in the country of habitual residence then determine the "merits of any underlying child custody claims."
 

 Id.
 

 The parent seeking return of a child must prove by a preponderance of evidence that the child was "wrongfully removed ... within the meaning of the Convention."
 

 Id.
 

 § 9003(e)(1)(A). The Hague Convention defines wrongful removal as taking a child in violation of custodial rights "under the law of the State in which the child was habitually resident immediately before the removal." Hague Convention art. 3.
 

 The key inquiry in many Hague Convention cases, and the dispositive inquiry here, goes to the country of the child's habitual residence. Habitual residence marks the place where a person customarily lives.
 
 See Webster's New International Dictionary
 
 1122, 2119 (2d ed. 1942) (defining "residence" as a place where a person "actually lives" and "habitual" as "customary").
 

 Building on our cases in the area,
 
 Ahmed v. Ahmed
 
 offers two ways to identify a child's habitual residence.
 
 867 F.3d 682
 
 (6th Cir. 2017). The primary approach looks to the place in which the child has become "acclimatized."
 

 Id.
 

 at 687
 
 . The second approach, a back-up inquiry for children too young or too disabled to become acclimatized, looks to "shared parental intent."
 

 Id.
 

 at 689 ;
 
 see also
 

 Robert v. Tesson
 
 ,
 
 507 F.3d 981
 
 , 992 n.4 (6th Cir. 2007). Every circuit to consider the question looks to both standards.
 
 Ahmed
 
 ,
 
 867 F.3d at
 
 689 ;
 
 see
 

 Mauvais v. Herisse
 
 ,
 
 772 F.3d 6
 
 , 11 (1st Cir. 2014) ;
 
 Guzzo v. Cristofano
 
 ,
 
 719 F.3d 100
 
 , 110 (2d Cir. 2013) ;
 

 Karkkainen v. Kovalchuk
 
 ,
 
 445 F.3d 280
 
 , 296 (3d Cir. 2006) ;
 
 Maxwell v. Maxwell
 
 ,
 
 588 F.3d 245
 
 , 253 (4th Cir. 2009) ;
 
 Larbie v. Larbie
 
 ,
 
 690 F.3d 295
 
 , 310 (5th Cir. 2012) ;
 
 Redmond v. Redmond
 
 ,
 
 724 F.3d 729
 
 , 746 (7th Cir. 2013) ;
 
 Barzilay v. Barzilay
 
 ,
 
 600 F.3d 912
 
 , 918 (8th Cir. 2010) ;
 
 Holder v. Holder
 
 ,
 
 392 F.3d 1009
 
 , 1020 (9th Cir. 2004) ;
 
 Kanth v. Kanth
 
 , No. 99-4246,
 
 2000 WL 1644099
 
 , at *1-2 (10th Cir. Nov. 2, 2000) ;
 
 Chafin v. Chafin
 
 ,
 
 742 F.3d 934
 
 , 938-39 (11th Cir. 2013).
 

 As to the first approach, the question is "whether the child has been physically present in the country for an amount of time sufficient for acclimatization and whether the place has a degree of settled purpose from the child's perspective."
 
 Ahmed
 
 ,
 
 867 F.3d at 687
 
 (quotations omitted). District courts ask these sorts of questions in determining a child's acclimatization: whether the child participated in "academic activities," "social engagements," "sports programs and excursions," and whether the child formed "meaningful connections with the [country's] people and places."
 

 Id.
 

 (quotations omitted).
 

 But the acclimatization inquiry, as
 
 Ahmed
 
 appreciated, may prove difficult, sometimes impossible, for young children. An infant "never forms" "or is incapable of" forming the kinds of "ties" to which the acclimatization standard looks.
 

 Id.
 

 at 689
 
 . Unwilling to leave infants with no habitual residence and thus no protection from the Hague Convention,
 
 Ahmed
 
 adopted an alternative inquiry for infants incapable of acclimating. In that setting,
 
 Ahmed
 
 tells courts to determine the "shared parental intent of the parties" and to identify the location where the parents "intended the child[ ] to live."
 

 Id.
 

 at 690
 
 .
 
 Ahmed
 
 says that "the determination of when the acclimatization standard is impracticable must largely be made by the lower courts, which are best positioned to discern the unique facts and circumstances of each case."
 

 Id.
 

 Both of these inquiries come back to the same, all-important point-the habitual residence of the child-on which the protections of the Hague Convention pivot.
 

 The Hague Convention's explanatory report treats a child's habitual residence as "a question of pure fact." Elisa Pérez-Vera,
 
 Explanatory Report on the 1980 Hague Child Abduction Convention
 
 ,
 
 in
 
 3
 
 Acts and Documents of the Fourteenth Session, Child Abduction
 
 426, 445 (1982);
 
 see
 

 Medellín v. Texas
 
 ,
 
 552 U.S. 491
 
 , 507,
 
 128 S.Ct. 1346
 
 ,
 
 170 L.Ed.2d 190
 
 (2008) (looking to "the postratification understanding" of signatory nations in interpreting a treaty (quotation omitted) ). Consistent with that understanding, our cases treat the habitual residence of a child as a question of fact.
 
 See, e.g.
 
 ,
 
 Ahmed
 
 ,
 
 867 F.3d at
 
 686 ;
 
 Jenkins v. Jenkins
 
 ,
 
 569 F.3d 549
 
 , 556 (6th Cir. 2009) ;
 
 Tesson
 
 ,
 
 507 F.3d at 995
 
 .
 

 Measured by these insights and these requirements, the district court's ruling should be affirmed. No one thinks that A.M.T. was in a position to acclimate to any one country during her two months in this world. That means this case looks to the parents' shared intent.
 

 In answering that question, we must let district courts do what district courts do best-make factual findings-and steel ourselves to respect what they find. While we review transcripts for a living, they listen to witnesses for a living. While we largely read briefs for a living, they largely assess the credibility of parties and witnesses for a living. Consistent with the comparative advantages of each role, clear-error review is highly deferential review. In the words of the Supreme Court, we leave fact finding to the district court unless we are "left with the definite and firm conviction that a mistake has been committed."
 

 United States v. U.S. Gypsum Co.
 
 ,
 
 333 U.S. 364
 
 , 395,
 
 68 S.Ct. 525
 
 ,
 
 92 L.Ed. 746
 
 (1948). In the words of the Sixth Circuit, we leave this work to the district court unless the fact findings "strike us as wrong with the force of a five-week-old, unrefrigerated dead fish."
 
 United States v. Perry
 
 ,
 
 908 F.2d 56
 
 , 58 (6th Cir. 1990) (quotation omitted).
 

 Nothing in Judge Oliver's habitual-residence finding leaves a "definite and firm conviction that a mistake" was made or, more pungently, strikes one as wrong with "the force of a five-week-old, unrefrigerated" aquatic animal. He presided over a four-day bench trial and heard live testimony from several witnesses, including most essentially the two parents: Monasky and Taglieri. After listening to the witnesses and weighing their credibility, Judge Oliver issued a 30-page opinion finding that Italy is A.M.T's country of habitual residence.
 
 Taglieri v. Monasky
 
 , No. 1:15 CV 947,
 
 2016 WL 10951269
 
 (N.D. Ohio Sept. 14, 2016).
 

 Judge Oliver's opinion is thorough, carefully reasoned, and unmarked by any undue shading of the testimony provided by the competing witnesses. Some evidence, as he pointed out, supported the finding that Monasky and Taglieri intended to raise A.M.T. in Italy. For example: Monasky and Taglieri agreed to move to Italy to pursue career opportunities and live "as a family" before A.M.T.'s birth.
 
 Id.
 
 at *7. The couple secured full-time jobs in Italy, and Monasky pursued recognition of her academic credentials by Italian officials.
 
 Id.
 
 Together, Monasky and Taglieri purchased several items necessary for raising A.M.T. in Italy, including a rocking chair, stroller, car seat, and bassinet.
 
 Id.
 
 at *8. Monasky applied for an Italian driver's license.
 
 Id.
 
 And Monasky set up routine checkups for A.M.T. in Italy, registered their family to host an
 
 au pair
 
 there, and invited an American family member to visit them there in six months.
 
 Id.
 

 Some evidence, as the trial court acknowledged, pointed in the other direction. For example: Monasky at times expressed a desire to divorce Taglieri and return to the United States.
 
 Id.
 
 She contacted divorce lawyers and international moving companies.
 
 Id.
 
 at *2, *8-9. And Monasky and Taglieri jointly applied for A.M.T.'s passport, so that she could travel to the United States.
 
 Id.
 
 at *3.
 

 Faced with this two-sided record, Judge Oliver had the authority to rule in either direction. He could have found that Italy was A.M.T.'s habitual residence or he could have found that the United States was her habitual residence. After fairly considering all of the evidence, he found that Italy was A.M.T.'s habitual residence.
 
 Id.
 
 at *10. Call our standard of review what you will-clear-error review, abuse-of-discretion review, five-week-old-fish review-we have no warrant to second-guess Judge Oliver's well-considered finding.
 

 Monasky resists this conclusion on several grounds. She claims that the district court's determination of habitual residence is a finding of "ultimate fact" that we review de novo. Appellant's Supp. Br. 20. Whatever Monasky means by
 
 ultimate
 
 fact, our cases lack such ambiguity: So long as the district court applies the correct legal standard, as Judge Oliver did here, the determination of habitual residence is a question of fact subject to clear-error review, sometimes characterized as abuse-of-discretion review, as the Convention's explanatory report says and as our cases confirm.
 
 See
 

 Ahmed
 
 ,
 
 867 F.3d at
 
 686 ;
 
 see also
 

 Pullman-Standard v. Swint
 
 ,
 
 456 U.S. 273
 
 , 287,
 
 102 S.Ct. 1781
 
 ,
 
 72 L.Ed.2d 66
 
 (1982) ("Rule 52(a) broadly requires that findings of fact not be set aside unless clearly erroneous. ... It does not divide facts into categories; in particular, it does
 not divide findings of fact into those that deal with 'ultimate' and those that deal with 'subsidiary' facts."). No such error occurred here.
 

 Nor does it make a difference that the district court's decision predated
 
 Ahmed
 
 . Because
 
 Ahmed
 
 followed existing circuit law,
 
 see
 

 Tesson
 
 ,
 
 507 F.3d 981
 
 ;
 
 Friedrich v. Friedrich
 
 ,
 
 983 F.2d 1396
 
 (6th Cir. 1993), Judge Oliver had no problem framing the habitual-residence inquiry. He found no acclimatization for this infant or any other because they "lack cognizance of their surroundings sufficient to become acclimatized to a particular country or to develop a sense of settled purpose."
 
 Taglieri
 
 ,
 
 2016 WL 10951269
 
 , at *6 (quoting
 
 Tesson
 
 ,
 
 507 F.3d at
 
 992 n.4 ). Monasky embraces that standard and that finding, as do we.
 

 Judge Oliver then "[a]ssume[d] that the Sixth Circuit would hold that the shared intent of the parties is relevant in determining the habitual residence of an infant child,"
 
 Taglieri
 
 ,
 
 2016 WL 10951269
 
 , at *10, as every other circuit to consider the question has done. He found that, considering the record as a whole, Monasky and Taglieri intended to raise A.M.T. in Italy.
 

 Id.
 

 That legal inquiry respects
 
 Ahmed
 
 , which applied the same standard. Monasky agrees with that standard; she just disagrees with the trial judge's finding under it.
 

 Any further concerns about the point can be resolved by recalling this reality.
 
 Ahmed
 
 itself
 
 affirmed
 
 the district court in that case. It saw no need to ask the district court to make any more findings or do anything more than it already had done. What was good for that case is good for this one.
 

 Monasky argues that she and Taglieri never had a "meeting of the minds" about their child's future home. Appellant's Br. 34. But that possibility offers a sufficient, not a necessary, basis for locating an infant's habitual residence. An absence of a subjective agreement between the parents does not by itself end the inquiry. Otherwise, it would place undue weight on one side of the scale. Ask the products of any broken marriage, and they are apt to tell you that their parents did not see eye to eye on much of anything by the end. If adopted, Monasky's approach would create a presumption of no habitual residence for infants, leaving the population most vulnerable to abduction the least protected.
 

 Monasky claims that Judge Oliver placed too much weight on the fact that Monasky and Taglieri established a matrimonial home in Italy and the fact that Monasky lacked definite plans to leave Italy.
 
 Taglieri
 
 ,
 
 2016 WL 10951269
 
 , at *7-8. But if clear-error review entitles an appellate court to rebalance the
 
 relative weights
 
 assigned to these sorts of details, that would indeed create a de novo standard of review, which is just what our cases prohibit. The question remains one of habitual residence. All agree that both facts-the location of the matrimonial home and any plans to leave it-bear on the riddle and thus were relevant considerations. Nothing in Judge Oliver's opinion suggests that he considered either one of them dispositive. That an "infant will normally be a habitual resident of the country where the matrimonial home exists" is a fact of life that we cannot change.
 
 Id.
 
 at *7.
 

 That does not mean that an infant's place of birth
 
 always
 
 will be the habitual residence if she remains there up to the abduction. That approach would create problems of its own. Imagine an American couple who gives birth to an infant during a brief stay in Italy, perhaps during a vacation or month-long residency, after which one of them takes the child before the vacation (and marriage) ends. In those instances, it would be difficult to maintain that the child habitually resides in Italy.
 

 That leaves one last argument for reversing Judge Oliver's decision: a preference for creating a presumption
 
 against
 
 finding a habitual residence for infants. But that is the worst of all possible worlds because it turns the Convention upside down. It would deprive the children most in need of protection-infants-of any shelter at all and encourage self-help options along the way, creating the risk of "abduction ping pong" at best,
 
 Ovalle v. Perez
 
 ,
 
 681 F. App'x 777
 
 , 784 (11th Cir. 2017), or making possession 100% of the law at worst.
 

 Sometimes the only way to resolve a complicated problem is to recognize that there is no single solution. As often happens with child-abduction disputes, the issues are fraught, the fact patterns unfortunate. Escalating acrimony between parents often severs a relationship beyond repair. And that usually results in conflicting testimony as to how things fell apart. But we will not make this case easier, and we are sure to make the next case harder, by assuming the role of principal decision maker. As with other fact-bound inquiries, so with this one. We must trust those with a ring-side seat at the trial to decide whose testimony is most credible and what evidence is most relevant. And to do that, we must treat the habitual-residence inquiry as we always have: a question of fact subject to deferential appellate review.
 

 Because the district court applied the correct legal standard and made no clear errors in its habitual-residence finding, and indeed quite carefully considered all of the competing evidence in its 30-page opinion, we affirm.
 

 CONCURRENCE