NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0228n.06

Case No. 21-5539

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td rowspan="11"></td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>    Plaintiff-Appellee,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>TONY ALLEN STAMPER,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>    Defendant-Appellant.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

**FILED**
Jun 07, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE

OPINION

Before: STRANCH, DONALD, and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. Tony Stamper and his girlfriend dealt methamphetamine to fund their own drug habit. After they got caught, Stamper pled guilty to several drug-trafficking offenses. The district court sentenced him to 248 months in prison—the bottom of his Guidelines range. But he says his sentence is procedurally unreasonable because the district court made factual errors in calculating that range. We disagree and affirm.

I.

Tony Stamper met Holli Houston at a Kentucky cellphone store in 2016. The pair started dating and soon moved in together; Stamper supported Houston and her children. Both methamphetamine users, the couple began dealing methamphetamine in 2017 to cover the costs of their own drug use.

But by 2018, Stamper was a wanted man in Kentucky—he'd racked up several drug-related arrests and wanted to leave the Commonwealth. So he brought Houston and her children to Tennessee, where they continued their illicit business. They soon found a new methamphetamine

supplier, "Slim," who would sell them more drugs for cheaper prices. They were able to expand their drug-dealing operation, and Houston testified that they were eventually dealing over a kilogram a week.

Each time Stamper and Houston bought methamphetamine, they would weigh it and then smoke some of it themselves to check the drug's quality. If it wasn't up to their standards, they wouldn't deal it. According to Houston, that only happened once—in December 2018. So she and Stamper arranged a time to exchange what they'd bought for better-quality methamphetamine from Slim.

Yet before they could do that, their luck ran out. Law enforcement arrested Stamper after he sold methamphetamine in a controlled buy. When officers searched his house, they found more than 500 grams of methamphetamine, digital scales, and fifteen firearms. At Stamper's direction, Houston kept dealing so she could pay for his bond. But two weeks later, she was also arrested.

Stamper pled guilty to conspiring to distribute and to possess with intent to distribute methamphetamine, aiding and abetting possession with intent to distribute methamphetamine, and possession of a firearm in furtherance of a drug-trafficking offense.

At Stamper's sentencing hearing, Houston (who had pled guilty as well) testified about the couple's conspiracy, telling the court about the quality and quantity of the methamphetamine they sold throughout their relationship. The government also introduced two reports detailing the quantity and purity of methamphetamine that agents had seized from Stamper and Houston. Relying on all of this, the district court found Stamper's offense involved 14 pounds of methamphetamine (6.35 kilograms) that averaged sixty-percent pure—which totaled over three

kilograms of actual methamphetamine.[1]  This produced a base offense level of 36.  Arriving at a base offense level of 33 after applying a three-level reduction for acceptance of responsibility, and using a criminal-history category of IV, the district court calculated Stamper's Guidelines range and sentenced him to 248 months' imprisonment, the bottom of the applicable range.[2]  Stamper now appeals.

## II.

Stamper argues that the district court made mistakes in determining both the quantity and the purity of the methamphetamine he sold, and that each mistake led the district court to calculate his sentence using the wrong base offense level.  These are challenges to the procedural reasonableness of his sentence, so we review the district court's legal conclusions de novo and its factual determinations for clear error.[3]  *United States v. Yancy*, 725 F.3d 596, 598 (6th Cir. 2013).

The Guidelines prescribe base offense levels for drug-trafficking offenses like Stamper's based on the quantity and purity of the drugs involved.  Based on a quantity of 3.8 kilograms, the district court used a base offense level of 36, which applies in cases involving "at least 1.5 [kilograms] but less than 4.5 [kilograms]" of actual methamphetamine—meaning the pure substance, rather than a mixture of methamphetamine and something else.  U.S.S.G. § 2D1.1(c)(2).  Now, the question before us is whether the district court accurately found that Stamper's offense involved 1.5 to 4.5 kilograms of actual methamphetamine.

---

[1] 3.8 kilograms is the derived quantity of actual methamphetamine after multiplying the weight (6.35 kilograms) times the average purity level (60 percent) (6.35 x .60 = 3.81).

[2] The 248-month sentence included a consecutive 60-month mandatory-minimum sentence for the firearm conviction.

[3] Stamper argues in his reply brief that these claims show the sentence was substantively unreasonable as well.  But he forfeited this argument by failing to raise it in his opening brief.  *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018).  In any case, the district court sentenced Stamper to the bottom of his Guidelines range, which makes his sentence presumptively reasonable.  *See United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc).  And Stamper points to nothing to defeat that presumption.

A.

*Quantity*. The district court estimated that Stamper was responsible for 14 pounds (or over six kilograms) of methamphetamine, based on Houston's testimony about the couple's dealing. To get that number, the court found that the pair dealt half a pound each week for 28 weeks—May 2018 to January 2019.

Stamper argues that the district court erred in relying on Houston's testimony, which he calls unreliable and self-interested. He points to a few alleged inconsistencies that he contends undermine everything she told the court. And he notes that Houston had reason to exaggerate the scope of their conspiracy because she was already a cooperating witness.

But it's the district court's job, not ours, to assess a witness's credibility. After all, "[w]hile we largely read briefs for a living, they largely assess the credibility of parties and witnesses for a living." *Taglieri v. Monasky*, 907 F.3d 404, 408 (6th Cir. 2018) (en banc). So we defer to the district court on such calls. *United States v. Esteppe*, 483 F.3d 447, 452 (6th Cir. 2007). That's true even when the witness has an incentive to testify against the defendant. *United States v. Montgomery*, 787 F. App'x 272, 275 (6th Cir. 2019). And here the district court, which listened to Houston's testimony, found that she was "credible." R. 82, Pg. ID 528.

Stamper disagrees. He notes that Houston often qualified her statements with "probably," and that she used methamphetamine throughout the time she testified about. But as the government points out, using "probably" could also mean Houston was trying to be particularly careful with her statements. And even Stamper admits there is no evidence that she suffered any drug-related cognitive impairment.

He further argues that her account of how much they bought is internally inconsistent. He points out that she said a "ball" was three-and-a-half ounces, when it's really three-and-a-half

grams. But in context, it's clear that Houston misspoke as to how much a ball is; she quickly clarified that the quantities they bought "led up from a ball to an ounce, and from one ounce to three or four ounces," signaling that a ball is less than an ounce. *Id.* at 498.

Stamper also takes issue with Houston's account of the first time she bought from Slim on her own. After recalling that they'd regularly bought one to one-and-a-half pounds at a time through a middleman, she said that she bought half a pound to a pound on her first solo visit to Slim, calling it "the most that [she] had ever purchased at one time at that point." *Id.* at 503. Stamper says that's inconsistent. But Houston was specifically discussing "the first time . . . [she] made the trip" to Slim without Stamper or a middleman. *Id.* If that's inconsistent at all, it's not so implausible "that a reasonable factfinder would not credit it." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). Crediting Houston's testimony was not clear error.

Stamper presents no evidence other than disputing Houston's testimony to suggest the district court's quantity finding is clearly erroneous. Here, the district court estimated the total quantity at 14 pounds. And approximations based on evidence are routine for district courts. *See United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008). Houston told the sentencing court that she and Stamper bought about half a pound or more at least once a week starting when they moved to Tennessee. Indeed, she noted that closer to their arrests, the couple would often purchase over a kilogram twice a week. The district court's estimate is reasonable—and far from clear error—given this testimony.

Thus, the district court did not err in finding that Stamper's offense involved 14 pounds of methamphetamine.

B.

Next, Stamper challenges the district court's determination as to purity. The district court averaged the purity percentages from the government's reports and found that Stamper's 14 pounds (6.35 kilograms) of methamphetamine were about sixty-percent pure—so he had dealt about 3.8 kilograms of actual methamphetamine (6.35 x .60 = 3.81). Stamper says this was the wrong approach for two reasons: (1) The government's reports included a duplicate entry and an unidentified entry that the court should not have relied on; and (2) using the average purity isn't the most conservative estimate. But no matter how we add up the math, or which theories we indulge, we end up in the same place. Remedying any counting error on the district court's part doesn't result in the quantity going below 1.5 kilograms, the lowest quantity to warrant a base offense level of 36 under the Guidelines. U.S.S.G. § 2D1.1(c)(2). Thus, any error in counting was harmless.

*Reports.* Stamper objects to the reports in two respects. First, he notes that one entry (entry 33) is listed twice. And second, he argues that the second report, which purported to record five baggies seized from Houston, actually contains six entries (entries 34 and 37 through 41) plus the duplicate.

The problem for Stamper is that these errors are harmless. Why? Because even if we exclude the duplicate entry and *any* other entry from the second report, Stamper still would have conspired to distribute far more than 1.5 kilograms of actual methamphetamine. Indeed, by our math, Stamper conspired at a minimum to distribute 3.46 kilograms of actual methamphetamine.[4]

---

[4] To calculate a new average excluding the duplicate entry (entry 33) and one of the second report's entries, we divide the total actual methamphetamine weight from the remaining entries by the total mixture weight from those entries. The lowest average purity—54.7 percent—results from excluding entries 33 and 37. And 54.7 percent of 14 pounds is 3.46 kilograms. Stamper fares no better with an unweighted average. The most favorable calculation there—excluding entries 33 and 40—still averages to 70.1-percent purity.

That falls squarely within the range to apply a base offense level of 36 under U.S.S.G. § 2D1.1(c)(2). So any error the district court committed in including these entries was harmless.

*Average.* Stamper next asserts the district court shouldn't have used average purity. He makes two arguments. First, he contends that the district court should have calculated his base offense level using the amount of methamphetamine mixture he dealt rather than the amount of actual methamphetamine. Using 14 pounds of mixed substance, rather than an estimate of actual methamphetamine, would result in a base offense level of 34. *See* U.S.S.G. § 2D1.1(c)(3). But the Guidelines instruct courts that they are to apply "whichever is greater" of the offense levels for the mixture or actual methamphetamine quantities. *Id.* § 2D1.1(c) n.B.

That's true even when the court can only estimate the quantity of actual methamphetamine. Indeed, this court has blessed district courts using information about seized drugs to "extrapolate . . . about other drugs involved in the case." *United States v. Shields*, 850 F. App'x 406, 417 (6th Cir. 2021) (citing *United States v. Jackson*, 470 F.3d 299, 310–11 (6th Cir. 2006)). That's exactly what the district court did here. Thus, it was proper to estimate the quantity of actual methamphetamine involved rather than relying on the total mixture.

Second, Stamper says the district court should have calculated average purity based on the lowest purity recovered: twenty-one percent. He argues the district court failed to "err on the side of caution" when it used average purity, rather than the lowest purity, to determine how much actual methamphetamine it attributed to him. Appellant's Br. 40 (quoting *United States v. Myers*, 198 F.3d 248, at *3 (6th Cir. 1999) (unpublished)). But the district court's estimate was supported by both the substances recovered—most of which were far purer than its average—and Houston's testimony. Houston testified that the low-purity methamphetamine was unlike what she and Stamper regularly dealt; indeed, she planned to return it to their supplier because it wasn't up to

their standards. Discounting that testimony and assuming Stamper dealt only methamphetamine mixture as impure as what the couple tried to return would go beyond erring on the side of caution—it would contradict the weight of the evidence. The district court reasonably rejected that approach.

What's more, even under Stamper's preferred purity estimation, any error would be harmless. A quick explanation shows why.

Stamper says any substance whose purity wasn't tested (*i.e.*, all the drugs he and Houston dealt that weren't recovered) should be calculated at twenty-one-percent pure. So we can take the district court's total weight, 14 pounds (or 6.35 kilograms), and subtract what was actually recovered and tested, 640.57 grams. That leaves about 5.7 kilograms. And twenty-one percent of that comes out to 1.19 kilograms of actual methamphetamine. Adding back the actual methamphetamine police recovered from Stamper and Houston brings the total to 1.55 kilograms.[5] So the evidence once again places Stamper within the range for a base offense level of 36. No amount of mathematical gymnastics can escape this conclusion.

\* \* \*

Stamper asks us to reweigh witness credibility and remand for resentencing. Neither is appropriate. Thus, we affirm.

---

[5] This counts entry 33 (the duplicate) only once. Stamper might respond that we should exclude one of the six entries from the second report, since the evidence report identifies only five entries and there are six purity reports. True enough. But matching the evidence report's entries to the purity reports, it's clear that only entry 34 or entry 39 (the two smallest entries) could be the erroneously included entry. And even excluding *both* of those, the total actual methamphetamine is still 1.548 kilograms.